UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY BROWN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 4:02CV00773 AGF |
| ) | |
| DAVE DORMIRE, ) | |
| ) | |
| Respondent. ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on the petition of Missouri state prisoner Larry Brown for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] For the reasons set forth below, habeas relief shall be denied.

On May 31, 1996, Petitioner was convicted by a jury of one count of first-degree burglary, three counts of sodomy, and one count of rape. The charges arose out of crimes committed on the night of December 30, 1992. Petitioner was sentenced on July 26, 1996, to consecutive terms of imprisonment of 10 years, 20 years, 30 years, 20 years, and life respectively. After the Missouri Court of Appeals affirmed Petitioner's convictions and sentences, Petitioner filed a timely motion for state post-conviction relief. The trial court denied the motion and the Missouri Court of Appeals affirmed this denial.

In the present action, Petitioner claims that his constitutional rights have been

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

violated in the following ways:

> (1)  The trial court improperly denied Petitioner's motion for a Frye hearing[2] on the admissibility of the State's DNA testing and probability evidence, and improperly admitted this scientifically unreliable evidence;
>
> (2)  The trial court improperly overruled Petitioner's objection to admission of the opinion testimony of one of the State's DNA experts on the population probability results of the DNA testing in this case;
>
> (3)  The trial court improperly refused to remove for cause two venirepersons who expressed their view that DNA evidence was infallible;
>
> (4)  The trial court improperly required Petitioner to state at trial words the perpetrator said to the victim during the rape so that the victim could identify Petitioner's voice;
>
> (5)  The trial court improperly overruled Petitioner's objection to the testimony of a police officer working on the case that he knew Petitioner from the past;
>
> (6)  The trial court submitted an erroneous instruction on reasonable doubt instead of using Petitioner's proposed instruction; and
>
> (7)  Petitioner was abandoned by post conviction counsel, who had a conflict of interest in that he also represented Petitioner on direct appeal.

---

[2]  Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), provided that only expert testimony deduced from a well-recognized scientific principle or discovery, sufficiently established to have gained general acceptance in the particular field in which it belongs, was admissible.  In 1993 the Supreme Court held that Frye was superseded by Federal Rule of Evidence 702, which requires the trial judge to ensure that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) (the scientific facts to which an expert testifies need no longer have achieved general acceptance in the scientific community to be admissible, rather the proponent need only demonstrate that the investigatory methods employed by the expert witness are consistent with generally accepted methods of scientific investigation).  Although Frye's more stringent "general acceptance" test has been superseded in federal courts, it remains the applicable standard in Missouri criminal cases.  See, e.g., State v. Keightley, 147 S.W.3d 179, 187 (Mo. Ct. App. 2004).

By Order dated July 21, 2005, this Court rejected the State's argument that the petition in this case was time-barred. Respondent now argues that habeas relief should be denied because the states courts' adjudication of Petitioner's claims was legally and factually reasonable.

## BACKGROUND

### Pretrial Proceedings and Voir Dire

Prior to trial, defense counsel moved for a Frye hearing with regard to the expert DNA and population genetics evidence the State proposed to introduce at trial. Counsel argued that although the Missouri Court of Appeals had previously held that DNA testing was reliable and admissible, the particular kind of testing involved in the present case had not been before that court. The trial court denied the motion. Tr. at 7-9. Defense counsel also moved to exclude the evidence of one of the State's DNA expert witnesses, Dr. Martin Tracey, on the ground that Dr. Tracey's testimony would be cumulative to that of the State's other DNA expert, Dr. Richard Guerrieri. Counsel equivocated as to what the nature of his objection was. Interpreting the objection to be one of lack of foundation to support Dr. Tracey's opinions, the court denied the motion. Tr. at 25-27.

The trial court also denied Petitioner's motion in limine to exclude the victim's out-of-court voice identification of Petitioner approximately two years after the crimes in question took place. At the hearing on the motion, it was explained that approximately three weeks after the crimes took place, police officers found Petitioner lurking outside the window of the victim's apartment, brought him to her door, and asked her if she

recognized him. The victim said she did not recognize him. Tr. at 12-14. Approximately two years later, the victim was present, at the prosecutor's request, at a hearing to reduce Petitioner's bond in another case. When the victim heard Petitioner speak, she told the detective who was sitting next to her that she recognized the voice as that of her assailant. Defense counsel argued that the procedure was too suggestive and unreliable for the identification to be admitted into evidence, noting that police records indicated that when the victim was interviewed within hours of the attack, she reported that her attacker was African-American and had spoken in a whisper. Tr. at 17-24. As noted above, the trial court denied the motion to exclude the out-of-court voice identification. Tr. at 24-25.

During voir dire, defense counsel asked the venirepanel if anyone believed that DNA testing was infallible. Venireperson Slovensky indicated that she did, but upon further questioning she stated that while DNA evidence would be hard to dismiss, she would listen to the other evidence presented. Tr. at 80-87. Venireperson Jackson also indicated to the court that he thought DNA, or "genetic fingerprinting," evidence was very strong evidence, but he too stated that he could listen to the evidence presented by both sides and then make a decision based upon all the evidence. Tr. at 93-95. The trial court denied Petitioner's request to remove these two venirepersons for cause, and Petitioner used two of his peremptory strikes to remove them from the panel.

**Evidence at Trial**

In affirming Petitioner's convictions and sentences, the Missouri Court of Appeals summarized the evidence adduced at trial, viewed in the light most favorable to the

4

verdicts, as follows. A review of the record confirms that this summary is fair and accurate. Petitioner does not challenge its accuracy, nor the sufficiency of the evidence, to support his convictions.

> The victim lived in an apartment and the crimes were committed in the early morning hours shortly after she had gone to bed. According to the victim, her attacker "smelled of alcohol." The police found shoe impressions in front of the patio door and through the living room towards the hallway. The police began speaking to neighbors. While speaking to a person at an apartment that was "catty-corner" and in the same building as the victim's apartment, police noticed mud tracks in the living room and beer cans in the wastebasket. Defendant and another person then walked into the apartment. Defendant had been visiting a friend at this apartment, and arrived the evening prior to the attack and had stayed until the following morning. One of the occupants testified that the occupants left defendant alone in the apartment at about 11:00 or 11:30 p.m. when they went to clean an office building, which usually took an hour and a half to two hours. This witness also testified that her carpet was clean when she left to go clean the offices but when she returned there was mud "all over."
>
> Defendant consented to a police interview and was told the shoes he was wearing were similar to the shoe impressions found at the crime scene. Defendant then told the detective that the impressions were there because upon returning to the apartment after buying some beer at a local store he had jumped down an embankment and took a shortcut. A fifty dollar bill, five twenty dollar bills, a ten dollar bill, three five dollar bills and two one dollar bills for a total of $177, were found in defendant's wallet. The victim's roommate had left a fifty dollar bill, two twenty dollar bills and four five dollar bills for a total of $110, on the kitchen table. A store clerk would later testify she cashed defendant's check for $66.50, and then gave him three twenty dollar bills, a five dollar bill, a dollar bill and some change. At a bond hearing and at trial, the victim recognized defendant's voice as that of the person who attacked her. At trial, the State presented evidence of DNA testing.
>
> \*   \*   \*
>
> A criminalist for the Missouri Highway Patrol testified that he was unable to extract sufficient "high molecular weight DNA" to perform the

restriction fragment length polymorphism ("RFLP") method of DNA analysis. The samples were then sent to a private laboratory, Roche Biomedical, for polymerase chain reaction ("PCR") testing. The criminalist testified that the PCR technique is more sensitive and therefore results could be obtained with a smaller sample than it takes for the RFLP method of testing. While at Roche Biomedical, Dr. Richard Guerrieri performed eight PCR based tests, using defendant's and the victim's blood samples and a stain from the victim's underwear. Dr. Guerrieri testified that "through each of the eight different genetic systems that I looked at, the DNA information present in the sperm fraction of the underwear stain matched the DNA profile from [defendant's] blood sample at each of those sites." Dr. Guerrieri also testified that finding another unrelated individual at random that would have the same DNA characteristics as defendant and the stain on the underwear would be "'roughly" one in 5,500,000 in Caucasians, one in 1,500,000 in African-Americans and one in approximately 300,000 Hispanics.

To the above, the Court adds that Dr. Guerrieri also testified that the chance of coincidentally having two people other than Petitioner and the victim match the DNA in the stain on the victim's underwear would be the product of approximately "one in a million times one in a million." Furthermore, the State presented the testimony of another DNA expert, Dr. Martin Tracey. On redirect examination, the prosecutor asked Dr. Tracey what the odds would be of having the suspect's DNA mixed with the victim's DNA in a stain on the victim's underwear that was analyzed after the rape. Defense counsel's objection on the basis that this called for speculation was overruled. Dr. Tracey testified that the odds that the two DNA samples were from people other than the suspect and victim, respectively, were each about one in a million, and so the odds of there being two people at random who matched the mixed stain were one in a million times one in a million, or one in a trillion. Tr. at 565-67.

Petitioner presented the testimony of his own DNA expert, who testified that PCR testing is extremely sensitive in that a minute amount of material could contaminate a sample and thus confuse the results of a test. Tr. at 593. He noted several steps in the testing where contamination could have occurred and opined that the odds that the DNA in question was not Petitioner's were 1 in 250 rather than one in 1,500,000. Tr. at 608-614.

The Court also adds that the victim testified to several statements her assailant had said to her, including that he was raping her because he "was a big, fat, fucking, white, ugly man and he wanted to fuck a young girl."[3] Tr. at 154. At a bench conference, the prosecutor asked the court to direct petitioner to state the above-quoted sentence so that the victim might make a voice identification. Tr. at 163. Defense counsel objected, arguing that if Petitioner were required to speak, he should at least be asked to say less prejudicial words. The court overruled the objection and the proceedings continued before the jury. After the victim described her out-of-court voice identification of Petitioner, the prosecutor asked the court to direct Petitioner to repeat the words quoted above so that the victim could identify him. Petitioner did so, and the victim identified him as her assailant. Tr. at 167-68.

The Court further adds that one of the investigating police officers who testified at trial, Mark Erhardt, testified, over defense counsel's objection, that he knew Petitioner

---

[3] In fact, the victim had seen the arm of the assailant and identified him as African-American, and from the record it appears that Petitioner is African-American.

prior to the incident in question. Petitioner testified on his own behalf, presenting an alibi defense and denying that he attacked the victim. Tr. 654-56.

In its "reasonable doubt" instruction to the jury, which followed Missouri Approved Instructions - Criminal 3d 302.04, the trial court told the jury, in relevant part: "The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the Defendant is guilty of the crime charged, you will find him guilty." Resp. Ex. A at 30. The court rejected Petitioner's proposed instruction, that did not include the "firmly convinced" language, and instead defined reasonable doubt as "a doubt that would make a reasonable person hesitate to act in the most important of his own personal affairs," and instructed the jury as follows: "If after your impartial consideration of all the evidence, you would not hesitate to rely and act upon such evidence in the most important of your own affairs, you may find him guilty." Id. at 54-55.

**Direct Appeal**

Petitioner raised six issues on direct appeal. These six issues were the same as claims one through six raised in his federal habeas petition, as set out above. Specifically, he argued that (1) his right to a fair trial was violated by the denial of his motion for a pretrial hearing to test the foundation and reliability of the State's DNA evidence, especially the population probability estimates, and by the admission of this unreliable evidence; (2) the State did not lay a proper foundation for the admission of Dr. Tracey's opinion that the odds of a mixed DNA sample from Petitioner and the victim

being found on the victim would be one in a trillion by not setting forth which database, procedure, protocol, or mathematical method Dr. Tracey used to arrive at this opinion; (3) the trial court improperly refused to remove venirepersons Slovensky and Jackson for cause after they indicated that they would give more weight to DNA evidence than to other evidence, shifting the burden to Petitioner to overcome their preconceived position on DNA evidence and forcing Petitioner to use two of his peremptory challenges to strike them from the jury; (4) the in-court voice identification procedure was unduly prejudicial in that Petitioner was required to speak words spoken by the assailant "in their most vulgar form," rather than other words by which the victim could have identified his voice;[4] (5) the trial court erred in overruling defense counsel's objection to Officer Erhardt's testimony that he knew Petitioner prior to the date of the charged crimes, testimony which suggested to the jury that Petitioner had engaged in other bad acts; and (6) the "firmly convinced" language in the reasonable doubt instruction suggested a higher degree of doubt than is constitutionally required for an acquittal. Resp. Ex. C.

The Missouri Court of Appeals affirmed Petitioner's convictions and sentences. In rejecting Petitioner's first claim, the appellate court held that the PCR method of DNA testing challenged by Petitioner had achieved general acceptance in the scientific community, and that the results from these tests were therefore admissible. The court

---

[4] On this point, Petitioner also stated that the out-of-court voice identification at the bond hearing was so suggestive as to make it unreliable. Resp. Ex. C at 49. Petitioner does not raise this claim in his habeas petition. Nor does he claim that the out-of-court identification tainted the in-court identification.

cited several Missouri cases in support of this proposition, and noted that Dr. Guerrieri testified that the scientific community generally accepted the PCR method as reliable. The Court of Appeals also cited a recent Missouri Supreme Court case which held that population frequency statistics based upon the "product rule" used in this case were generally accepted in the scientific community and were admissible. The court noted that Dr. Guerrieri's failure to discuss lab error rates went to this witness's credibility and to the weight of the evidence, rather than to its admissibility. Resp. Ex. F. at 2-5.

In rejecting Petitioner's second claim that an inadequate foundation had been laid for the challenged statement made by Dr. Tracey regarding the population probability results of the DNA testing, the Court of Appeals noted that Petitioner's objection did not appraise the trial court of the specific grounds, as argued on appeal, to exclude the evidence. Namely, Petitioner did not argue below that an opinion of the odds of two persons other than the victim and defendant having the same DNA profiles found on the victim's underwear was without a proper foundation unless there was testimony as to the database, procedure, protocol and mathematical method supporting the opinion. Even if Petitioner's objection had been sufficient to preserve the matter for review, the Court of Appeals held that any error in admitting the evidence was not prejudicial because Dr. Guerrieri's substantially similar testimony had been admitted without objection. Id. at 5-8. The Court of Appeals concluded that no purpose would be served by addressing Petitioner's remaining claims and summarily denied them. Id. at 9.

**State Post-conviction Proceedings**

Petitioner sought state post-conviction relief, raising four claims. The motion court denied Petitioner's motion, and Petitioner's sole point on appeal was that post-conviction counsel abandoned him and had a conflict of interest because counsel had represented Petitioner on direct appeal. The Court of Appeals affirmed the denial of post-conviction relief.

## DISCUSSION

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "AEDPA effected a move toward greater deference in the § 2254 courts' review of state-court decisions." Brown v. Leubbers, 371 F.3d 458, 460 (8th Cir. 2004) (en banc).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives

at the opposite result. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law; the application must also be "unreasonable." Williams, 529 U.S. at 411; Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable").

> The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even more deferential review. Relief may be granted if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." Id. § 2254(e)(1).

Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).

**DNA Evidence**

Petitioner's first two claims concern the State's experts' DNA and population genetics evidence. These claims were denied by the Missouri courts based on state law. It is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v.

12

McGuire, 502 U.S. 62, 67-68 (1991). For purposes of habeas review under § 2254, therefore, this Court considers only whether the state trial court's evidentiary rulings in Petitioner's case rendered his trial "fundamentally unfair." Weston v. Dormire, 272 F.3d 1109, 1113 (8th Cir. 2001).

Petitioner does not claim that the state's experts were unqualified. Dr. Guerrieri explained the process for DNA extraction and analysis used. Trial counsel raised several challenges to the accuracy of the DNA results on cross-examination and presented his own expert on the matter, which further establishes that the admission of this evidence did not render Petitioner's trial fundamentally unfair. The Missouri appellate court's determination that Petitioner's challenge to the DNA evidence went to its weight, not its admissibility, was not contrary to or an unreasonable application of federal law. See Kinder, 272 F.3d at 545 (Missouri Supreme Court's determination that methodology employed by prosecutor's expert in DNA testing and in evaluating results was generally accepted in the scientific community was not an unreasonable application of clearly established federal law, and thus habeas relief was not warranted); Stills v. Dorsey, 7 F. App'x 856, 859 (10th Cir. 29, 2001) (state court determination that PCR method of DNA testing satisfied the standard for expert evidence set out in Daubert was not contrary to federal law, and thus habeas relief was not available to petitioner); Payne v. McKune 280 F. Supp. 2d 1259, 1270 (D. Kan. 2003) (rejecting habeas petitioner's claim that state trial court erred in admitting DNA evidence where the method used was explained to the jury by a forensic scientist).

With regard to Dr. Tracey's "one in a trillion" statistical probability evidence, the

Court recognizes that the introduction into evidence in a criminal trial of such statistical evidence raises concerns. See United States v. Massey, 594 F.2d 676, 681 (8th Cir. 1979) (discussing the potentially exaggerated impact of such statistical probability evidence on the trier of fact). Nevertheless, the Court cannot say that admission of the evidence in question here rendered Petitioner's trial fundamentally unfair. Although Dr. Tracey did not explain the mathematical models used for his probability conclusions, substantially the same conclusions had previously been introduced into evidence through the testimony of Dr. Guerrieri, without objection by defense counsel.[5] See Payne, 280 F. Supp. 2d 1270 (D. Kan. 2003) (state supreme court's conclusion that statistical analysis of PCR DNA evidence satisfied the Frye standard was not contrary to federal law, and thus, petitioner was not entitled to habeas relief based on his claim that this evidence was improperly admitted). Furthermore, the prosecutor introduced a considerable amount of probative, non-DNA evidence linking Petitioner to the crimes, such as the voice identification, the currency in Petitioner's possession, the mud tracks in the apartment where Petitioner was staying, and the similarity between the shoe impressions and the shoes Petitioner was wearing.

---

[5] The Court notes that Dr. Tracey's "one in a trillion" statement, as well as Dr. Guerrieri's comparable statement, appear to be misleading. It was undisputed that the underwear was the victim's, and that she was raped. Thus, the probability of a random match between the stain on the underwear and the victim (one in a million) should not have been multiplied by the probability of a random match between the male component of the stain and Petitioner (one in a million). Petitioner never raised this as error, and the Court does not believe that this particular testimony rendered Petitioner's trial fundamentally unfair, in light of the testimony by both Drs. Tracey and Guerrieri that the odds of a random DNA match between the male component of the stain and Petitioner being one in a million (Dr. Tracey) or one in one-and-a-half-million (Dr. Guerrieri).

In sum, the Court concludes that the state courts' adjudication of Petitioner's first two claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or that was based on an unreasonable determination of the facts in light of the evidence presented at trial.

**Denial of Request to Strike Two Venerirepersons for Cause**

Petitioner argues that the trial court violated his constitutional rights by refusing to remove venirepersons Slovensky and Jackson for cause, forcing Petitioner to use two peremptory challenges to remove these venirepersons. Because Petitioner has not shown the seated jury was partial, his Sixth Amendment claim fails. See Ramsey v. Bowersox, 149 F.3d 749, 758 (8th Cir. 1998) ("'So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated'") (quoting Ross v. Oklahoma, 487 U.S. 81, 88 (1988)); Cox v. Norris, 133 F.3d 565, 572 (8th Cir. 1997) (same).

As for a due process claim, "[b]ecause peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." Ross, 487 U.S. at 89 (internal citations omitted); see also Ramsey, 149 F.3d at 758. Missouri law provides that "criminal defendants are entitled to a '"full panel of qualified jurors before being required to make peremptory challenges . . . and failure to sustain a meritorious challenge for cause is prejudicial error."'

15

Ramsey, 149 F.3d at 758 (quoting Sloan v. Delo, 54 F.3d 1371, 1387 (8th Cir. 1995)). Here, the trial court decided that the views of Slovensky and Jackson would not prevent or substantially impair their performance as jurors, and thus overruled Petitioner's challenges for cause. Tr. at 96. On habeas review, this Court's role is limited to deciding whether the record fairly supports the state court's decision that Slovensky and Jackson could be impartial. See Ramsey, 149 F.3d at 758. The Court sees no error. Slovensky and Jackson said that they were capable of listening to all the evidence. As a result, the trial court properly denied Petitioner's challenges for cause, and Petitioner received a full panel of qualified jurors before exercising peremptory challenges.

**In-Court Voice Identification**

Petitioner argues that his right to a fair trial was violated by the impermissibly suggestive and prejudicial procedure of requiring him to utter in front of the jury the words said by the perpetrator to the victim. Some courtroom procedures are so inimical to the presumption of innocence that they violate a defendant's due process rights. Estelle v. Williams, 425 U.S. 501, 503 (1976). Compelling a defendant to appear at trial in prison garb, for example, is impermissible because the constant reminder of the defendant's incarcerated status may affect jurors' perception of him as a wrongdoer. Id. at 504.

Here, after the victim testified to several statements her assailant had made, the trial court allowed the prosecutor to require Petitioner to stand and repeat the most vulgar of those statements for purposes of having the victim identify his voice. In United States v. Olvera, 30 F.3d 1195 (9th Cir. 1994), the Ninth Circuit, faced with a similar situation, stated as

16

follows:

> Compelling a defendant to utter a criminal's words clearly has the potential to violate due process. . . . Much like the wearing of prison clothes, the uttering of a criminal's statements isolates the defendant from all others in the courtroom and invariably associates him . . . with the charged conduct, thus tending to brand him in the juror's eyes with an unmistakable mark of guilt.

Id. at 1197 (citations omitted).

The Ninth Circuit noted that the potential for prejudice was greater when the defendant does not testify, and the only statements the jury would ever hear from the defendant are those spoken by the criminal. Id. Here, as noted above, Petitioner did testify on his own behalf. The Ninth Circuit also recognized that "a defendant's utterance of a criminal's statement may not have undue influence on the jury where the jury has a clear understanding that the utterance is necessary for identification of the defendant by a witness." Id. Such is the situation here. The prosecutor made clear that the procedure was being used for the victim to identify Petitioner's voice. Tr. at 167. Furthermore, here it was reasonable to introduce voice identification in light of the fact that the victim could not identify her assailant visually. It would have been a far better procedure to have had Petitioner utter neutral words. Nevertheless, the Court cannot say that the state appellate court's rejection of this claim on direct appeal was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. See United States v. Domina, 784 F.2d 1361, 1374 (9th Cir. 1986) (requiring defendant in a robbery case to repeat the words of the robber -- "Ladies this is a holdup. Put the money in the bag" -- did not violate the defendant's due process rights where victim

17

testified that she could only identify the robber by his voice and the prosecutor made clear to the jury that the procedure was for the purpose of voice identification).

**Reference to Petitioner's Prior Bad Acts**

Petitioner claims that Officer Erhardt's testimony that he knew Petitioner prior to the date of the crimes in this case violated Petitioner's right to a fair trial by introducing into evidence other bad acts of Petitioner. As noted above, it is not within a federal habeas court's province to reexamine state-court evidentiary rulings. Estelle, 502 U.S. at 67-68. Here, this Court cannot say that the testimony in question infected the entire trial with prejudice, and that absent the challenged comment the verdict would have been different. No prior bad acts of Petitioner were directly referenced by Officer Erhardt, and after defense counsel's objection was overruled, the prosecutor turned to the events of the present case and did not call any attention to the fact that Officer Erhardt had had some previous contact with Petitioner. Accordingly, this claim does not warrant habeas relief. See Young v. Bowersox, 161 F.3d 1159, 1161 (8th Cir. 1998) (prosecutor's question -- "How many people have you shot?" -- improperly suggesting to the jury that habeas petitioner had prior bad acts, did not violate petitioner's right to a fair trial where question did not refer to any specific past acts or indicate what the circumstances surrounding those acts might be, and evidence of petitioner's guilt was strong); Robinson v. Leapley, 26 F.3d 826, 832 (8th Cir. 1994) (no constitutional error found in the admission of other crimes evidence).

**Reasonable-Doubt Instruction**

Eighth Circuit precedent forecloses Petitioner's challenge to Missouri's reasonable

doubt jury instruction which was used in this case. See Hall v. Luebbers, 341 F.3d 706, 720 (8th Cir. 2003) (citing Harris v. Bowersox, 184 F.3d 744, 750-52 (8th Cir.1999) (holding that Missouri's reasonable doubt instruction satisfies due process)).

**Post-conviction Counsel's Performance**

Petitioner's last claim for habeas relief is also without merit. There is no federal constitutional right to post-conviction counsel. Coleman v. Thompson, 501 U.S. 722, 752 (1991). Thus, ineffective assistance of post-conviction counsel is not a ground for habeas relief. Cox v. Burger, 398 F.3d 1025, 1030 (8th Cir. 2005); Mack v. Caspari, 92 F.3d 637, 640 (8th Cir. 1996) (claim of abandonment by state post-conviction counsel is not cognizable in federal habeas action).

## CONCLUSION

The Court concludes that petitioner is not entitled to habeas relief. The Court does not believe that reasonable jurists might find the Court's assessment of petitioner's claims debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2254(d)(2). See Miller-El v. Cockrell, 537 U.S. 322, 336-37 (2003) (standard) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED** that Larry Brown's petition for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall not issue in

this case.

A separate Judgment shall accompany this Memorandum and Order.

                                                                                                              _____
                                                                                                              AUDREY G. FLEISSIG
                                                                                                              UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2005.